Good afternoon. Illinois Appellate Court First District Court is now in session. The First Division, the Honorable Justice John Griffin presiding. Case number 1-6-2562, People v. Janet Strickland. Good afternoon and welcome. As you know, you both get 20 minutes. Does the appellant want to reserve any time? Yeah, just a few minutes, please. Okay, five minutes. Okay, if the attorneys are going to argue, please state your name and spell your last name for the record. My name is Carl Mundt, last name M-U-N-D-T, and I represent Janet Strickland. Good afternoon, Your Honors. My name is Assistant State's Attorney Justin Erb, spelled E-R-B, and I'm here representing the state of the people of Illinois. Okay, thank you. Counsel, you want to proceed? Mr. Mundt? All right, thank you. Good afternoon, Your Honors, and may it please the court. My name is Carl Mundt. I'm with the Office of the State Appellate Defender, and I represent Janet Strickland in this matter. In this case, the evidence shows that Deshawn developed a plan to kill William, and he talked about that plan in front of Janet, but the evidence was insufficient to prove that Janet solicited Deshawn to kill William as discussed in Issue 1, and the evidence was the evidence did not show that Janet was involved in a conspiracy with Deshawn as discussed in Issue 2. Regarding Issue 1, the evidence was insufficient to prove that Janet commanded, encouraged, or requested Deshawn to kill William. Janet knew of Deshawn's plan to kill William and did not thwart Deshawn's plan to kill William, but that is not the same as affirmatively encouraging Deshawn to kill William. The plain and ordinary meaning of the word encouragement requires some affirmative action or words from the defendant in support of the plan. Merely knowing of the plan and staying silent is not enough. The failure to discourage is not the same as affirmatively encouraging. The state's brief repeatedly makes vague statements that Janet and Deshawn discussed Deshawn's plan to murder William. However, the state doesn't identify any specific statements where Janet ever requested Deshawn to kill William or affirmatively encouraged Deshawn to kill William. In fact, the only evidence we have about Janet ever responding to any of Deshawn's statements were when Janet specifically told Deshawn not to shoot William. In Janet's statements to the police, she acknowledged a few times that in Deshawn's presence she may have said things like she wished William were gone or she wished he would go away. However, wishing that someone is dead is not the same as asking someone to kill them. So do you believe that if someone tells you that they, you gain knowledge that someone is going to kill someone and then you turn around and say that in the defendant, a defendant, any defendant, not necessarily your client, turn around and says that I wish the person were dead, you don't believe that's encouragement? Well, if it happened exactly the way you describe it, directly in response to someone saying I'm going to go kill him, and then the other person responds, I wish he was dead, that might be a tougher call, but that's not what the evidence shows in this case. Well, but let's pause for a second then, because it's my understanding that in this case, that there was knowledge that there was some discussion or some plan that he would kill him, correct? That Deshawn would kill him, correct? Yes. So she did know about it, and it's also clear that she would say to Deshawn, I wished he were dead. Yes, but not necessarily within the same sentence or exactly the same conversation. So you believe that if it's 10 minutes later, then it doesn't count? At what point does it start mattering? I mean, it's really hard to draw a line. Obviously, this is one of those things, it's not a... So you're saying there's a continuum. So then let me ask you this question. So if it's five minutes later, does that create a connection? I don't know that it's necessarily a time situation. It would matter a lot more about the context of the conversation. And obviously, in a situation like this, where we don't have recordings of the conversation, or all of the parties through the conversation recounting what happened, it's really hard to know. But you gotta admit that if someone, if a young adult tells an older adult, in this case, a senior and a very young adult, that I'm gonna kill someone, usually the first reaction is, well, no, don't kill him. No, you shouldn't kill anybody. But instead, it was, I wished he were dead. I don't think, I don't agree that the if you watch the videotaped interrogation, Janet, she tells the police that on multiple occasions, when Deshaun brought up, oh, I'm so mad at grandpa, I could kill him. She told him repeatedly, no, don't kill him. You're not gonna kill your grandfather. When Deshaun mentioned having a friend on the east side that he could get, she told him, no, leave that alone. You're not gonna do it. She explained to the police that the times when Deshaun was saying, I wanna kill grandpa and things like that, she didn't think he was serious. She thought he was just speaking in anger. And she also explained that when she said those things about, I wish he were dead, she was speaking in anger. And none of the evidence shows that she ever responded to Deshaun saying, I wanna kill grandpa by her saying, I wish he were dead. They seem to be separate conversations where at times when Janet was angry, she would say, I wish William would go away. And then separate times Deshaun would talk about his plan to kill William. None of the evidence shows that Deshaun said, I'm gonna kill William. And she said, I wish you were dead. There was no nod and a wink. We have no evidence of any of that. It was bits and pieces of different conversations that didn't happen together in context. And again, merely wishing someone were dead does not, is not the same thing as asking or encouraging someone to kill them. And in order to be guilty of solicitation, the encouragement or request has to be coupled with the intent that the person actually commit the murder. And in this case, the only evidence we have about Janet's mental state are Lovetta's testimony, where she said that she, she overheard a conversation when Deshaun said he was gonna shoot grandpa. And she told him, no, don't do that. Don't shoot him. And her statements to the police where she repeatedly said she did not think Deshaun was serious. And she did. She never wanted Deshaun to kill William. In the state's brief, they talked about Lovetta's testimony and how it corroborated this. It did not. Lovetta never once testified that she heard Janet ask Deshaun to kill William or encourage Deshaun to kill William. She, she referenced a conversation about Janet saying she would poison William. And then Deshaun said, oh, I'm going to go upstairs and kill him. But she even acknowledged that they were both laughing and she didn't think they were serious. And, and, and as I previously referenced, the one time Janet responded to Deshaun saying, I want to kill William, she said, no, don't do it. So the only evidence we actually have of Janet's response to Deshaun discussing his plan was her saying, no, don't do it. That is simply insufficient evidence to show that she encouraged or requested Deshaun to kill William. And in terms of Danny Armstrong's testimony, Danny testified that he never spoke with Janet. He only testified about things that allegedly Deshaun told Danny that Janet had said. So that's, it just, it's, that reflects very little about Janet's mental state or what Janet actually said since it's coming, you know, sort of through multiple people, particularly given Deshaun's role in this, it's, that raises serious questions about the reliability of such statements. And an important note on that is, if Janet was involved with the plan to kill William with Deshaun, why would Deshaun have been so hesitant to discuss that plan in front of Janet in the car? They specifically testified that Deshaun and Danny talked about the plan when they were on the way to pick up Janet, but once Janet got in the car, they no longer talked about this plan. If Janet was part of the plan, there would have been no reason not to talk about it in front of her. So the fact that Danny and Deshaun didn't talk about the plan in front of Janet is an indication that they weren't involved in the plan and they didn't want her to be involved. And if you guys have no more questions about issue one, I'll move into issue two. All of these things we just discussed are essentially the prejudice argument of the ineffective assistance of counsel in issue number two. The co-conspirator statements that came in are effectively the evidence used to convict her of solicitation. The state's motion asking to have these statements admitted listed some sort of background facts and then laid out the 11 statements that they sought admission for. And when you remove the co-conspirator statements that they were Janet and William were married and Deshaun lived in the same house as them, that is far short of establishing a prima facie case of a conspiracy between Janet and Deshaun. And even if you add in the evidence at trial, again, it falls short of establishing a conspiracy between Janet and Deshaun where the only evidence is that Janet knew of Deshaun's plan, but merely knowing of the plan and even not stopping the plan is insufficient to establish a conspiracy. Mr. Mundt, you count your argument as the state did not establish a prima facie case for the admission of these nine or 10 statements, correct? Yes. Are you saying they didn't establish a prima facie case at the motion or at trial or both or what? Both. Certainly not in the motion. And even if you add in the evidence from trial, it is our position that falls short of establishing a prima facie case of a conspiracy. And indeed, at the end of the bench trial, when the trial court was issuing its ruling, he said he made a statement that the evidence of the conspiracy was debatable. Now, he was never asked to rule on the specific question of whether the state had made a prima facie case of a conspiracy, but the mere fact that he mentioned it was debatable shows that the evidence is far from overwhelming, if you will, about the conspiracy. Would you agree that if a party does not establish a prima facie case in a pre-trial motion in limine, any error that might be acknowledged at that point can be cured through the evidence of trial? In the context of these kinds of motions, the... In the context of your argument that there was no prima facie case at the time of the motion in limine, my question is, assume that's true, is it your position that the movement, the party offering that testimony could not establish a prima facie case through the evidence of trial? No, I'm not saying that. The case law does say that the prima facie case does not have to be established specifically in the motion. They can use the evidence at trial to do so. In his opposition, they did not do that in this case, however. Okay, thank you. I guess if your honors have no other questions, we would ask this court to reverse Janet Strickland's conviction outright pursuant to issue one and reverse and remain for a new trial pursuant to the motion. Mr. Erb? Okay. Good morning, your honors, counsel. My name is Assistant State's Attorney Justin Erb, and I am representing the people of the state of Illinois. May it please the court. The evidence was plainly sufficient to convict defendant for soliciting first-degree murder. There is no question that defendant commanded, encouraged, or requested that DeShawn kill William Strickland. Not only is there Lovetta Smith's account of defendant's conversation with DeShawn about killing William, defendant herself all but admitted that she asked DeShawn to kill William during her discussion with the police. She said that she often told DeShawn that she wished William was gone or that somebody would kill him. She said this all in front of her grandson, who she knew also wanted to kill William. So really, the only fact in dispute on this appeal is intent. Whether or not defendant really meant it when she made those statements to DeShawn. Defendant would have you believe here that she was either joking or she was venting or some sort of combination thereof, and that this entire situation was a tragic misunderstanding on DeShawn's part. However, we know that DeShawn didn't think she was joking. We know from Danny Armstrong's grand jury testimony that DeShawn believed that defendant wanted him to William dead, but she was willing to pay both a thousand dollars to effectuate the murder, or at least that was DeShawn's understanding of what defendant wanted. So we can also discover defendant's intent by the way she behaved throughout this entire ordeal. So if you put yourself in defendant's shoes, after years of frustration with her husband, she made a habit of storming downstairs and loudly declaring to her grandson, who again, she knew wanted to kill William, that she wished her husband was dead. She also talked, at least on one occasion, although defendant would say she was joking, about poisoning him. She knew that her grandson reciprocated these feelings. She also knew that they both had access to a gun and that he was serious about wanting to do this. She also knew that DeShawn's girlfriend, Lovetta, was secretly living with them in their home beyond William's knowledge, and that she could have her removed whenever she wanted, clearly showing that she had some degree of control over the quality of DeShawn's life. So what did she do when DeShawn made it clear to her grandma, I want to kill grandpa, I am taking this seriously? She did nothing. She did not warn William. She did not hide the gun. She did not threaten to tell William about Lovetta if DeShawn kept it up. There was one weak-willed protest after several conversations, several statements, where they both all, where defendant all but said, you need to kill William, and DeShawn said, I am going to kill William. Okay, furthermore, if defendant was kidding or venting about her prior statements to DeShawn, how would she have acted after the killing? Certainly not by inviting DeShawn back into her home the night that she knew he killed William. Not by ordering furniture, not by buying everybody meals, and not by buying her grandson a car. Certainly not by rewarding her husband's murder time after time after time. All of these factors show a clear intent that the murder be done. Defendant knew what she was doing, that by constantly egging on DeShawn to commit murder against her, his own grandfather, that she was encouraging him to do this. She was telling him that their lives would improve if he committed this murder. But counsel, the issue is, Mr. Muntz is arguing that there's a sufficiency of evidence issue here, and one of the elements of the crime is that she either commanded, encouraged, or somehow persuaded him to commit the murder, or requested that he commit the murder. And counsel is arguing that that element is not met. So he's arguing sufficiency of the evidence. So when he's arguing sufficiency of evidence, he's claiming that that, and I think his argument is that that element was not met. Can you respond to that? Because just simply the fact that she knew that the grandson wanted to someone would kill him or wished he were gone, that doesn't rise to the level of commanding, requesting that someone should kill him. Your Honor, I think there are two parts to this. The first one is whether or not she, as you said, commanded, requested, or encouraged that DeShawn kill William Strickland. The people's evidence that we have from defendant's own admissions to the police, where she testified that months or weeks before the actual murder, she would go downstairs and loudly say, he makes me so mad, I wish someone would just kill him. If you look to the people, to the video of her conversation with the police, she directly says that she thinks that probably encouraged DeShawn to actually go about the murder. So the people's position of this is those statements, combined with the ones that Lovetta provided about them joking about poisoning William and about how they were going to do it, those were the encouragements or the requests to kill William. The second part of this is intent. So defendant would have the argument, yes, I said these things, and yes, they might have actually even encouraged DeShawn to kill William, but I didn't mean it. This was, this is all a misunderstanding, I was just joking, and DeShawn took it seriously, and this is not what I wanted to happen. So by showing evidence that after she made these statements, she saw the way DeShawn responded by saying, you know what, that's a good point, I think we should kill him. The way DeShawn would say, I have my friend going to do this, the way she said, that he said, I'm going to use a gun, and all the ways of doing this, combined with the way she reacted after by knowing that he killed William and saying, you know what, here's a phone, here's some tattoos, here's some money you've wanted, here's a car, that shows that she intended it, that it wasn't a misunderstanding, that it wasn't a joke. She encouraged him to do it, and she got away with it. Now the people will readily admit there was no conversation, or at least provided at trial, where a defendant went up to DeShawn and said, I am commanding you right now to kill him. However, the people's position is there was a lot of manipulation, to quote, or to paraphrase Shakespeare work, you know, won't somebody rid me of this meddlesome priest. She was directly stating what she wanted to be done, and she knew she had a lot of power over DeShawn, and she knew the way that DeShawn interpreted it as a request, and that is sufficient evidence to convict her of solicitation. So defendant also points to the one time she discouraged DeShawn from killing William, which was brought up both during her confession with the police and from LaVetta Smith. This, she claims, is proof positive of her intent, that she did not actually want William However, the crime of solicitation is completed when the request is made. The fact that defendant withdrew after the fact is not relevant to whether or not she committed solicitation. Defendant may respond by telling DeShawn that she didn't, like, not to kill William, or apologize, not to kill William. It just shows she never meant it in the first place. But consider this, she only balked at it the second time DeShawn brought it and times even before that. The response to defendant's consistent musings was just to stay silent and not do anything and to let this happen. So after years of dissatisfaction with her husband, defendant starts talking with DeShawn about killing him, sometimes in ways that it might be joking, sometimes just stating out loud what she hoped that William would die. Her grandson, who she knows has access to a gun, told her that he planned to kill William, but his friends would not participate. Only then did she say, okay, actually don't do it, and then DeShawn goes and does it anyway. After William is dead, instead of being horrified and taking some steps to either get away from DeShawn, or to turn him in, or at least in some way reprimand him, she gives him a new car, she gives him access to money like he's never seen before. This series of events leads to the inevitable conclusion that she wanted her husband dead, and she wanted her grandson to do it, and that she simply meant what she said when she said that I hope somebody kills William. And if there's no more questions on that, I would like to move to the second issue. Okay. Okay. In order for a co-conspirator statement to be admissible, despite the general rule against hearsay evidence, the people just had to show that two or more people intended to commit a crime, they engaged in a common plan to commit that crime, and that the crime was actually committed. So two out of those three elements were met. We know the two people are defended in DeShawn. We know that the crime of first degree murder was committed. The only question here is whether the people showed, just by a preponderance of the evidence, using independent evidence that could be brought at trial, that they engaged in a common plan to do it. So this is the evidence that the people brought during trial. Both defendant and DeShawn hate William because he has a good amount of money but doesn't let them have any. After that, we learned from defendant that she was loudly declaring to DeShawn that she wished that William was dead. We also learned from defendant's confession with the complete police that DeShawn was providing defendant with more and more detailed and concrete plans about how he would actually do it. We also know from defendant's own statements to the police that she was kept in the loop about DeShawn talking to Danny Armstrong and taking part in William's murder. Then on the night of the murder, we know that defendant and DeShawn were keeping in touch. We know that there was some exchange of phones because we know that not only from the phone records but from defendant's statement to the police that at some point, DeShawn came home, knocked on the window, handed her the phone. We know that defendant and DeShawn were in contact after the murder as well because we have the statements of both Philetta Smith and, or I'm sorry, Stitz and Lovetta Smith that he used her fax phone to call defendant and say, is he dead? Is he gone? Can I come home? Then after the fact, as stated before, defendant doesn't go to the police. She doesn't kick DeShawn out. She doesn't try to move away. She rewards him with cars, phones, and money. So this is enough to establish a prima facie case that they engaged in a common plan or a common design to kill William. If you kill William, I will use the money that I get from that murder to reward you. So there's a, the defendant sees on a lack of direct evidence of conspiracy. He says that there's no direct proof that DeShawn, of DeShawn and defendant meeting and developing an exact plan for how they would execute William. But the case law is very clear. The people do not need to provide direct evidence of this conspiracy. This court has held time and again that in order to show a prima facie case for conspiracy, the circuit court should use circumstantial evidence and make broad inferences. Everything in this case from what said she told DeShawn to her actions before, during, and after William's murder is sufficient to show, despite a preponderance of the evidence, that she was in the loop doing this and that she and DeShawn had a common plan. Now there are ways to argue against this narrative without a doubt, and defendant successfully did that at trial. The trial in fact found that the evidence was not sufficient beyond a reasonable doubt to prove that DeShawn engaged in a common scheme. However, this is not the same proposition that what the people had to prove, which is just a preponderance of the evidence. Defendant points to some evidence that doesn't fully match with the people's narrative and defendant offers some alternative narrative that could plausibly explain defendant's behavior. However, that's not what this court is here to look at. It is just to look at the record using the looking at the evidence and like most favorable to the people, was there a prima facie case more than 50-50. It did not have to be overwhelming. The evidence was quite simply there. So for that reason, the people request that this court affirm defendant's convictions and do not issue her a new trial. Thank you. Mr. Blunt. I just have a few brief points, your honor. The state mentioned that only on one occasion did Janet discourage and tell DeShawn not to do this. That's not what the evidence shows. In her statement to the police, she made it clear that on multiple occasions when DeShawn would bring this up, she would tell him to leave it alone or she would tell him not to. Only one time came in through Levetta's testimony, but the video of Janet's statement, she told the police over and over again, she told DeShawn not to do this. And she also explained that she did not believe DeShawn was serious. She explained that DeShawn often said big things but wouldn't follow up with his actions. So she believed that even though he was saying these things, he would not actually do it. And she also explained that when she came down the stairs and loudly declared, as the state referred to it, that she wished William were dead, she again explained those were statements made in anger. She did not actually want William to die. Would you address counsel's argument that after the death, her actions supported the idea of her intent? I most certainly will. You have to keep in mind that although Janet had, at this point, knowledge that DeShawn likely killed her husband, at the same time, he was her grandson, and she loved him and supported him. Even if he did this horrible thing, she can't be expected to just like toss him out on the street and leave him to fend for himself. It's not unusual or it's not abnormal for Janet to continue loving and supporting a close family member even when something horrible happens. And the argument about the furniture, she did not go out and purchase a bunch of furniture the day after. The evidence is clear. She said in her statement and the sister, Leslie, she acknowledged these were rented from rent-a-center. And Janet explained they had been rented previously. They just were not delivered until that particular day. And the buying food for the guests the next day, it was not an elaborate catered meal with a private bar and things like that. Janet told the police it was pizza and Taco Bell and White Castle. She was simply providing food for her guests who came to mourn the loss of her husband. And in terms of the financial motive, as discussed in the reply brief in detail, William's death would not have had a financial benefit to Janet. She was dependent on his home and his food and the money that came from his pension. And Leslie testified that William would get that pension while he was alive. So if William is dead, Janet, who only got a small disability check each month, would no longer have that source of income, that source of support. So the fact that the notion that this was done for a financial motive just doesn't add up with the evidence that we have. The state also talked about how after Deshaun talked about these things, Janet did not stop Deshaun or did not warn William. That's true, but she doesn't have to. Her not stopping this plan doesn't make her guilty of solicitation. The law is clear, merely knowing about a crime or even acquiescing in it is insufficient to prove that she conspired or solicited with that plan. The state also referenced the phone call where Deshaun allegedly asked, is he dead? That was contradicted by Stitt's testimony who said she did not hear him say that. Also, again, only having one side of that conversation doesn't tell you much because it's entirely plausible that Deshaun called and on the phone he was told your grandfather was just shot. So him asking, is he dead, is no indication at all that Janet was involved in a plan to murder him. And the state's attorney, excuse me, assistant state attorney Erb, he referenced the judge's findings at the end. The judge, again, acquitted Janet of being accountable for this murder and went on to say that the evidence of the conspiracy was debatable. All of this shows that the evidence that Janet solicited Deshaun to kill William or conspired with Deshaun to kill William is far from the foregone conclusion that the state represents that it is. I also need to point out one last thing. In reference to the second issue, the state said that the evidence is looked at in the light most favorable to the state when deciding whether it met a prima facie case. I don't believe that is the case. The first issue is sufficiency of the evidence claim. That is certainly looked at in the light most favorable to the state. But I don't believe that under the prejudice prong and ineffective assistance of counsel, the evidence is looked at in the light most favorable to the state. And for those reasons, your honor, and the reasons stated in our briefs, we ask that this court vacate Janet Strickland's conviction for solicitation of murder under issue one and reverse and remand for a new trial under issue two. Thank you. Thank you very much. We really appreciate your hard work. You did a great job both on the briefs and in the argument, and you'll be hearing from us shortly. Thank you.